999 S.W.2d 874 (1999)
In re The ESTATE OF Orville Peter LIVINGSTON, Deceased.
Orville Francis Livingston, Appellant,
v.
Rachel Lee Nacim, Independent Executrix, Appellee.
No. 08-98-00236-CV.
Court of Appeals of Texas, El Paso.
August 12, 1999.
*875 Scott Segall, Martin & Segall, El Paso, for Appellant.
Ronald J. Stading, Roberto Sandoval, El Paso, for Appellee.
Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

OPINION
McCLURE, Justice.
Orville Francis Livingston (Livingston) appeals from a judgment admitting to probate *876 his father's 1997 will and appointing his sister, Rachel Lee Nacim (Nacim), as independent executrix of the estate. We affirm.

FACTUAL SUMMARY
Orville Peter Livingston died on July 29, 1997 in El Paso, Texas at the age of seventy-nine years. On September 4, 1997, Livingston filed an application for probate of a will dated October 7, 1991 as a muniment of title purporting to be the last will and testament of the decedent. Four days later, Nacim filed a contest, alleging that the decedent had revoked the 1991 will, and an application to probate a will dated January 14, 1997. At the bench trial, the notary public and Nacim's husband, Victor, testified to establish the will. The probate court found that Livingston failed to prove that the 1991 will had not been revoked, that the 1997 will had been executed with the formalities required by the Texas Probate Code thereby revoking the 1991 will, and that Nacim had met her burden for admittance of the 1997 will to probate and for issuance of letters testamentary. Accordingly, the court appointed Nacim as independent executrix.

THE FORMALITIES OF EXECUTION
In his first issue for review, Livingston challenges the trial court's finding that the will admitted to probate was executed in conformity with the requirements of Section 59 of the Texas Probate Code. In particular, he contends that because the signatures of the witnesses are found only on the self-proving affidavit and not upon the will itself, the will is invalid. Second, he argues the will is void because two of the witnesses to the will, Nacim and her husband, have an interest in the estate.
To admit a will to probate, a trial court must find that the will is valid under the Probate Code. Guthrie v. Suiter, 934 S.W.2d 820, 829 (Tex.App.Houston [1st Dist.] 1996, no writ). Section 59(a) of the Probate Code provides:
Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator in person or by another person for him by his direction and in his presence, and shall, if not wholly in the handwriting of the testator, be attested by two or more credible witnesses above the age of fourteen years who shall subscribe their names thereto in their own handwriting in the presence of the testator.
TEX.PROB.CODE ANN. § 59(a)(Vernon Supp. 1999). The trial court found that:
The Will dated January 14, 1997 was signed by the decedent, Orville Peter Livingston, who was over the age of eighteen at the time of the execution of this Will and his signature was attested by two or more credible witnesses that were each above the age of fourteen years who subscribed their names to the Will in their own handwriting and in the presence of the testator, Orville Peter Livingston.
In arguing that the will is invalid because the witnesses signed the self-proving affidavit attached to the will, but did not sign the will itself, Livingston relies on the rule stated in In re Pettengill's Estate, 508 S.W.2d 463 (Tex.Civ.App.Amarillo 1974, writ ref'd n.r.e.) which in turn followed the Supreme Court's decision in Boren v. Boren, 402 S.W.2d 728 (Tex.1966). The Supreme Court reaffirmed Boren in Wich v. Fleming, 652 S.W.2d 353, 354 (Tex.1983). These cases held that the signatures to the self-proving affidavit could not supply the necessary signatures to the will. Wich, 652 S.W.2d at 355; Boren, 402 S.W.2d at 729; Pettengill, 508 S.W.2d at 465. However, the Legislature overruled Boren in 1991 by amending Section 59 to provide that:
(b) An affidavit in form and content substantially as provided by Subsection (a) *877 of this section is a `self-proving affidavit.' A will with a self-proving affidavit subscribed and sworn to by the testator and witnesses attached or annexed to the will is a `self-proved will.' Substantial compliance with the form of such affidavit shall suffice to cause the will to be self-proved. For this purpose, an affidavit that is subscribed and acknowledged by the testator and subscribed and sworn to by the witnesses would suffice as being in substantial compliance. A signature on a self-proving affidavit is considered a signature to the will if necessary to prove that the will was signed by the testator or witnesses, or both, but in that case, the will may not be considered a self-proved will. [Emphasis added.]
TEX.PROB.CODE ANN. § 59(b)(Vernon Supp. 1999). By virtue of Section 59(b), then, the signatures of the witnesses on the self-proving affidavit are considered signatures to the will. Livingston's first argument must fail.
Livingston next argues that the will is invalid because the Nacims have an interest in the estate. He relies on Section 61 of the Probate Code which, in relevant part, provides:
Should any person be a subscribing witness to a will, and also be a legatee or devisee therein, if the will cannot be otherwise established, such bequest shall be void, and such witness shall be allowed and compelled to appear and give his testimony in like manner as if no such bequest had been made. [Emphasis added.]
TEX.PROB.CODE ANN. § 61 (Vernon 1980).
Under Section 61, a will is not void merely because a witness is a legatee, provided the will can be proved by other witnesses. Wilkerson v. Slaughter, 390 S.W.2d 372, 374 (Tex.Civ.App.Texarkana 1965, writ dism'd). The decedent bequeathed half of his estate to Rachel Nacim while leaving the remainder to be divided equally among Livingston and the other two sisters, Katherine Elizabeth Livingston and Jeannine Antoinette Livingston. Victor Nacim, however, is not a legatee or devisee under the will. Therefore, his sworn testimony offered at the trial could establish the will and the bequest to Rachel Nacim is not void. TEX. PROB.CODE ANN. § 84(b)(1)(Vernon 1980)("If not self-proved as provided in this Code, an attested written will produced in court may be proved ... [b]y the sworn testimony or affidavit of one or more of the subscribing witnesses thereto, taken in open court."); see Lehmann v. Krahl, 155 Tex. 270, 285 S.W.2d 179, 182 (1955)(where one of the witnesses to a will was the husband of one of the legatees thereunder, he was not an incompetent witness). Livingston's second argument must likewise fail. Accordingly, the trial court did not err in finding that the decedent's signature was attested by two or more credible witnesses. The first issue for review is overruled.

TESTIMONY OF HANDWRITING EXPERT
In Issue Two, Livingston attacks the trial court's consideration of evidence regarding the validity of the decedent's signature on the 1997 will. Nacim maintains that Livingston waived this complaint. We must agree.
After the conclusion of trial on the merits on January 14, 1998, Judge Higgs indicated that he had concerns about the quality of the signature on the 1997 will. After obtaining their agreement, he ordered both parties to deposit $1,500 into the registry of the court for the purpose of retaining a qualified document examiner to be selected by the court. The court further ordered that the report should be provided within twenty to thirty days. On February 2, 1998, Nacim filed a motion for entry of judgment, alleging that Livingston had *878 failed to make the $1,500 deposit. At the hearing on the motion held on February 20, 1998, Nacim alleged that on October 1, 1997, Livingston hired Al Keon, a handwriting expert, who determined that the decedent's signature on the 1997 will was an original signature, not a forgery. Keon stated the same conclusion in his February 17, 1998 deposition. After Nacim tendered the deposition to the trial court, Livingston's counsel made the following statement:
Judge, Mr. Keon was not our expert and he wasn't a consultant and he did not produce a report for us or Mr. Livingston and so Mr. Stading is incorrect when he says that he was our expert or my expert. And Mr. Keon also in that deposition, which we will stand by the record and we know that the Court will read the deposition, and in that deposition Mr. Keon states that in cases like this before the Court, other handwriting experts have differed with his conclusion and the Court, of course, can take that into consideration for whatever decision the Court may wish to announce in this case. [Emphasis added.]
...
And, of course, Judge, we were not under any pressure to do anything. We took itI took it upon myself with the conclusion [sic] by Mr. Livingston, my client, that we should disclose to the Court that we had indeed seen Mr. Keon as a consultant and so therefore there was no pressure on us to disclose anything. The law is very clear that when a consultant is hired for that purpose, his findings are not discoverable and so we were not under any pressure to do it. Ethically, Judge, I disclosed it because it was my opinion that the Court should have all of the information before it so that the Court could make a decision based on all of the evidence. Again, Judge, we stand by the record that if that if the Court wishes to hire another expert, of course, we have no say-so on it. It's your decision. This case is like a personal injury case where different doctors come in and testify as to injuries and they are experts and one doctor may differ with the other side's expert and then the jury will make a decision and you are the jury, Judge, in what you believe and what you don't believe. So whatever the Court wishes to do we, of course, will follow the Court's decision. [Emphasis added.]
The trial judge immediately appointed Nacim as administrator of the estate but announced that he would defer his ruling pending a report from a disinterested expert, Janet Mason of Houston, Texas. Although the record before us does not reflect whether Mason submitted a report, and if so, what she concluded, the trial court made the following finding of fact:
That the Will dated January 14, 1997 was signed by Orville Peter Livingston and his signature on the Will dated January 14, 1997 was not a forgery; this fact was confirmed by independent witness testimony and by Proponent's own consulting expert's analysis.
Livingston did not object to the Court's consideration of Keon's report and deposition on the subject of the authenticity of the signature. In fact, the emphasized portion of counsel's statements indicates that he affirmatively acquiesced. Consequently, the complaint is waived. TEX. R.APP.P. 33.1(a)(1). Issue Two is overruled.

UNDUE INFLUENCE
In Issue Three, Livingston contends that the evidence is legally insufficient to support the trial court's finding that the 1997 will was not the product of undue influence. Before addressing the merits of this complaint, we will first consider whether Livingston has correctly framed the issue on appeal.

*879 Livingston's Burden at Trial

When a will contest is instituted prior to the admission of the will to probate, as in this case, the proponent of the will shoulders the burden of proving that the will has not been revoked. See TEX. PROB.CODE ANN. § 88(b)(3)(Vernon 1980); Goode v. Estate of Hoover, 828 S.W.2d 558, 559 (Tex.App.El Paso 1992, writ denied). As the proponent of the 1991 will, Livingston had the burden to prove that it had not been revoked by the 1997 will. See In the Matter of the Estate of McGrew, 906 S.W.2d 53, 56 (Tex.App.Tyler 1995, writ denied)(if the contestant of the will produces evidence of revocation to cast doubt upon the continuity of the will, the presumption of continuity is rebutted and the proponents of the will must prove, by a preponderance of the evidence, that the will has not been revoked). He sought to meet this burden by proving that the 1997 will was the product of undue influence.

Livingston's Burden on Appeal
Admitting that he had the burden of proof, Livingston alleges that the evidence is legally insufficient to support the court's finding on the undue influence issue.[1]

Standard of Review
A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. There are two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding,[2] the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." See Creative Manufacturing, Inc. v. Unik, Inc., 726 S.W.2d 207, 210 (Tex.App.Fort Worth 1987, writ ref'd n.r.e.).
When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which he had the burden of proof, i.e., challenging the trial court's finding as a matter of law, the appellant must demonstrate on appeal that the evidence conclusively established all the vital facts in support of the issue. Sterner v. Marathon Oil Company, 767 S.W.2d 686, 690 (Tex.1989); Kratz v. Exxon Corp., 890 S.W.2d 899, 902 (Tex.App. El Paso 1994, no writ); Chandler v. Chandler, 842 S.W.2d 829, 832 (Tex.App.El Paso 1992, writ denied). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. Sterner, 767 S.W.2d at 690. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Sterner, 767 S.W.2d at 690; Kratz, 890 S.W.2d at 902. Second, if there is no evidence to support the finding, then, the entire record must be examined to see if the contrary proposition is established as a matter of law. Sterner, 767 S.W.2d at 690; Kratz, 890 S.W.2d at 902. Only if the contrary position is conclusively established will the *880 point of error be sustained. Kratz, 890 S.W.2d at 902; Chandler, 842 S.W.2d at 832.

Elements of Proof
Undue influence implies the existence of testamentary capacity in the testator that was subjected to and controlled by a dominant power or influence. Rothermel v. Duncan, 369 S.W.2d 917, 922 (Tex.1963); Green v. Earnest, 840 S.W.2d 119, 121 (Tex.App.El Paso 1992, writ denied). Before a will may be set aside on the ground of undue influence, the contestant must prove:
 the existence and exertion of an influence;
 the effective use of that influence to subvert or overpower the mind of the testator at the time the will was executed; and
 the execution of a will which the testator would not have executed but for such influence.
Rothermel, 369 S.W.2d at 922; Green, 840 S.W.2d at 121.

The Evidence Elicited at Trial
On January 14, 1997, Juan Ramos was notified by his employer to go to the home of Victor Nacim for the purpose of notarizing a document. Victor is the cousin of Ramos' employer. Ramos had previously met Victor when he visited his cousin at work, but he had never socialized with Victor nor had he been to Victor's home. When Ramos arrived, Victor introduced him to the decedent and to Rachel Nacim. Ramos recalled that the decedent asked whether Ramos was there to notarize his will. Ramos believed the decedent was dressed appropriately, understood the questions asked of him, and had no difficulty communicating with Ramos. Ramos observed him sign the will in the presence of both Rachel and Victor Nacim. He did not appear nervous, confused, fearful, or pressured to sign the will. The decedent did not discuss the will's contents with Ramos nor ask him any questions about it. Based upon his observations, Ramos formed the opinion that the decedent was of sound mind and competent to make a will and he understood that he was in the act of preparing a will.
Victor Nacim testified that he and Rachel lived with the decedent from 1989 until 1992. A few weeks prior to January 14, 1997, Victor overheard the decedent discussing the will with Rachel. The decedent asked Victor and Rachel to witness his will. Victor made arrangements for a notary public to come to the house and notarize the will on January 14. When Victor arrived home from work around 5 p.m., Rachel and the decedent were there. He changed clothes and they all talked for a while. When Ramos arrived, Victor introduced him to the decedent and Rachel. The decedent asked Ramos, "Are you here to notarize my will?" They all sat at the dinner table and the decedent signed the will, followed by Victor and Rachel. Ramos asked the decedent and Rachel for identification and then notarized the signatures. Victor, who had known the decedent for several years, said that he appeared normal and answered all questions appropriately. He did not seem confused or incoherent nor did he appear nervous or fearful. Furthermore, Victor was of the opinion that the decedent was, as always, of sound mind to conduct his own business affairs. The decedent remained at the house and visited with them for approximately a half hour before driving himself home.
Because these facts demonstrate that the decedent freely executed the will, we conclude that there is some evidence to support the adverse finding on the issue of undue influence. Because Livingston failed to overcome the first hurdle, we need not reach the second. Issue Three is overruled; the judgment is affirmed.
NOTES
[1] Pertinent to this issue, the court made the following written findings:

14. That Orville Peter Livingston executed the Will dated January 14, 1997 of his own free will without duress, undue influence, or threats of any kind.
. . . . .
16. Proponent has failed to meet his burden of proof that Decedent's Will dated October 7, 1991 was not revoked.
[2] This is sometimes referred to as a "failure to find" or a "non-finding."